UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| KIRBY HOLLINS and LYDIA HOLLINS,<br><br>Plaintiffs,<br><br>v.<br><br>3M COMPANY,<br><br>Defendant,<br><br>and<br><br>3M COMPANY,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>BEREAN ENERGY CORPORATION, *et al.*,<br><br>Third-Party Defendants. | ) | No. 6:26-CV-12-REW-CJS<br><br>OPINION & ORDER |

*** *** *** ***

In December 2023, Kirby and Lydia Hollins (collectively, "Plaintiffs") initiated the present action against 3M Company ("3M"). *See* DE 1 (Complaint). 3M filed a motion for summary judgment based on Plaintiffs' purported failure to comply with the statute of limitations. *See* DE 72 (Motion for Summary Judgment). Ultimately, and for the reasons articulated below, the Court finds the case untimely and GRANTS DE 72.

## I. BACKGROUND

On December 11, 2023, Plaintiffs filed the present suit. *See generally* DE 1. Plaintiffs allege that Kirby Hollins was employed as an underground coal miner in Pike County, Kentucky

from approximately 1987 to 2007. *See id.* ¶ 1. During that time, Hollins used respiratory protection equipment manufactured by 3M.[1] *See id.* ¶ 10. Decades after his employment ended, Hollins was diagnosed with coal workers' pneumoconiosis/black lung disease ("CWP"), a progressive and irreversible lung condition often caused by exposure to coal mine dust and/or crystalline silica. *See id.* ¶ 14-15. Plaintiffs assert that Hollins's illness resulted from dust exposure and his use of 3M's respirators, alleged to be "defective, unsafe, and unreasonably dangerous." *See id.* ¶ 28. Plaintiffs also assert that Hollins "was not aware more than one year prior to the filing of th[e] [c]omplaint . . . of information from which he ought to have been aware of both the nature of his injuries and [their] causal connection to" 3M. *See id.* ¶ 15. He claims a notice date, as to CWP, of March 23, 2023. *See id.*

As a result of Hollins's illness, Plaintiffs have brought a product liability claim, *see id.* ¶¶ 27–29, a negligence claim, *see id.* ¶¶ 30–40, and a breach of warranty claim, *see id.* ¶¶ 41–43. Additionally, Plaintiffs seek punitive damages, *see id.* ¶¶ 44–49, and Lydia Hollins, as spouse, has brought a derivative claim for loss of consortium, *see id.* ¶¶ 50–53. 3M denies any liability and has asserted various defenses.[2] *See generally* DE 17 (3M Answer). 3M also filed a third-party complaint, naming 15 coal mine operators as third-party defendants. *See* DE 34. The following operators have settled their claims with 3M and have since been dismissed from the action: Lynx Coal Company, Inc.; Cougar Coal Company, Inc.; CBM Mining, Inc.; Mayo Resources, Inc.; and Knox Creek Coal Corporation. *See* DE 53 (Order Dismissing Lynx Coal, Cougar Coal, CBM Mining, and Mayo Resources); DE 78 (Order Dismissing Knox Creek Coal).

[1] Plaintiffs also named American Optical Corporation and Cabot CSC LLC. *See* DE 1 at 1. However, both defendants have since been dismissed from the action. *See* DE 24 (Order Dismissing American Optical and Cabot). 3M is the only remaining defendant.

[2] 3M agrees that it is incorporated in Delaware with its principal place of business in Minnesota. *See* DE 17 ¶ 2. Given Plaintiffs' Virginia citizenship, and the fact that they have alleged damages in excess of $75,000, this case is properly before the Court pursuant to its diversity jurisdiction.

While discovery progressed, Plaintiffs moved to bifurcate the statute of limitations issue, intending for the Court to decide that issue before addressing any dispositive motions based on separate grounds. *See* DE 25 (Motion to Bifurcate). Although 3M opposed that motion, *see* DE 26 (Bifurcation Response), United States Magistrate Judge Candace J. Smith ultimately granted the requested relief and amended case deadlines accordingly, *see* DE 54 (Order Granting Bifurcation).

Shortly after, 3M filed the instant motion for summary judgment. *See* DE 72. In their motion, 3M claims that Hollins had both actual and constructive knowledge of his injury more than one year prior to the filing of the complaint. *See id.* at 12–16. In particular, 3M highlights treatment that Hollins received from: (1) April Colley, a nurse practitioner and his primary care provider, from September 2021 through October 2022; (2) Dr. Khaled Mansour, a cardiologist, on March 24, 2022; (3) Dr. Sami Jawad, a pulmonologist, on December 8, 2022 and February 9, 2023; and (4) Jessica Rasnick, a nurse practitioner, on February 23, 2023. *See id.* at 5–8. The radiologist that read Hollins's films also figures into the mix. Likewise, 3M asserts that Hollins had constructive knowledge that his lung disease was related to his use of respirators in coal mines. *See id.* at 17–20. Finally, 3M claims that neither fraudulent concealment nor equitable estoppel would apply to toll the statute of limitations. *See id.* at 21–23. 3M separately argues that Plaintiffs' breach of warranty claim is untimely and fails for lack of privity, *see id.* at 23–24, and that Plaintiffs' derivative claims must fail as a consequence of the aforementioned shortcomings, *see id.* at 25.

Plaintiffs dispute some of 3M's arguments in their response. *See* DE 73 (Summary Judgment Response). While they do not contest 3M's arguments on their breach of warranty claim and derivative claims, they do dispute that Hollins had actual or constructive knowledge of his injury prior to February 9, 2023. *See id.* at 13–24. 3M filed a reply largely reiterating its prior

claims but focused on the issue of whether notice requires a definitive diagnosis under Kentucky law. *See* DE 76 (Summary Judgment Reply). The motion is now ripe for review. Applying the discovery rule, the actual notice issue raises a factual dispute. As to constructive notice, however, Kentucky accrual principles and reasonable diligence requirements applicable to Plaintiff Hollins result in the finding, on the undisputed record, that Hollins's claim accrued no later than December 8, 2022 and thus is untimely.

## II. Legal Standard

### A. Summary Judgment

Summary judgment is appropriate when the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a)–(c). In determining whether there exists a genuine dispute of material fact, the Court must consider all facts and draw all inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Further, the Court may not "weigh the evidence [or] determine the truth of the matter" in evaluating whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986). However, "only admissible evidence [i.e., evidence capable of meeting the admissibility threshold at trial] may be considered by the trial court in ruling on a motion for summary judgment." *Rogers v. Lilly*, 292 F. App'x 423, 428 n.3 (6th Cir. 2008) (quoting *Smoot v. United Transp. Union*, 246 F.3d 633, 649 (6th Cir. 2001)).

The moving party bears the initial burden of showing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2552 (1986). If the moving party satisfies its burden, the burden shifts to the non-moving party to produce "specific facts" that

suggest a "genuine issue" for trial. *See id.* at 2553. Notably, this is "an affirmative duty to direct the court's attention to those specific portions of the record upon which [the non-moving party] seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). If the non-moving party cannot make a showing sufficient to establish the existence of an essential element of its case, then "Rule 56(c) mandates the entry of summary judgment." *Celotex*, 106 S. Ct. at 2552.

A fact is "material" when the substantive law that underlies the dispute identifies it as such.[3] *See Anderson*, 106 S. Ct. at 2510. That is, "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* An issue is "genuine" when "there is sufficient evidence favoring the [non-moving] party for a jury to return a verdict for that party." *Id.* at 2511 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 88 S. Ct. 1575, 1592 (1968)). Sitting in diversity, the Court must look to federal law to resolve procedural issues, and Kentucky law to resolve substantive ones. *See Hanna v. Plumer*, 85 S. Ct. 1136, 1141 (1965); *Erie R.R. Co. v. Tompkins*, 58 S. Ct. 817, 822 (1938).

Summary judgment is also proper when the non-moving party's pleading fails to state a claim upon which relief can be granted. *See Carter v. Ford Motor Co.*, 561 F.3d 562, 567 (6th Cir. 2009). Although the analysis of a pleading's sufficiency at the summary judgment stage

[3] While not in dispute, it is worth stating for completeness why Kentucky law is the applicable substantive law in this matter. A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits. *See Doe v. Etihad Airways, P.J.S.C.*, 870 F.3d 406, 435 (6th Cir. 2017). Kentucky courts apply the "any significant contacts" test in tort actions. *See Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009). Pursuant to that test, "any significant contact with Kentucky [i]s sufficient to allow Kentucky law to be applied." *Id.* (quoting *Bonnlander v. Leader Nat'l Ins.*, 949 S.W.2d 618, 620 (Ky. Ct. App. 1996)). Because Plaintiffs (or, at least, Mr. Hollins) were allegedly injured in Kentucky, the "any significant contacts" test is assuredly met. *Cf. Brewster v. Colgate-Palmolive Co.*, 279 S.W.3d 142, 145 n.8 (Ky. 2009). As a result, the Court applies Kentucky law.

resembles the analysis of a Rule 12(b)(6) motion, the two inquiries are not identical. *See id.* at 567–68. Generally, by the time a party moves for summary judgment, the liberal federal discovery rules have brought "the gravamen of the dispute . . . frankly into the open for inspection by the court." *See id.* at 568 (quoting *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 789 (6th Cir. 2005)). Accordingly, district courts need not apply the more flexible plausibility standard articulated in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964–69 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949–50 (2009), when assessing the legal sufficiency of a claim at the summary judgment stage. Instead, if the undisputed facts show that the plaintiff cannot establish a viable legal claim, summary judgment is warranted. *Cf. Smith v. City of Salem*, 378 F.3d 566, 576 n.1 (6th Cir. 2004).

Both Kentucky and federal law in diversity ensure a role for the jury, in appropriate cases, relative to the statute of limitations. Thus, where application of a statute of limitations turns on a genuinely disputed fact issue, the law would require that the jury resolve the issue. *See Cutter v. Ethicon, Inc.*, No. 20-6040, 2021 WL 3754245, at *4 (6th Cir. Aug. 25, 2021) ("[T]he ultimate validity of a statute of limitations defense is a question of law . . . . [b]ut it is the jury's role to resolve any disputes of fact, including disputed inferences, as to when a plaintiff discovered or should have discovered her cause of action") (internal citations omitted); *see also 3M Co. v. Engle*, 328 S.W.3d 184, 189 (Ky. 2010). However, where the record is clear or facts are not disputed, the Court resolves timeliness as a matter of law. *See Warick v. Tussey*, No. CV 7:23-74-KKC, 2024 WL 4156822, at *6 (E.D. Ky. Sept. 11, 2024) ("Where the operative facts are not in dispute, determining whether the statute of limitations has expired is a question of law for the Court to decide") (citing *Alverson v. Am. Nat. Ins. Co.*, 30 F. App'x 491, 494 (6th Cir. 2002)); *see also Emberton v. GMRI, Inc.,* 299 S.W.3d 565, 572–73 (Ky. 2009) ("Where the pertinent facts are not

in dispute, the validity of the defense of the statute of limitations can and should be determined by the court as a matter of law.") (internal citations omitted).[4]

### B. Statute of Limitations

Under Kentucky law, "a personal injury claim . . . must be filed within one year of the time when the cause of action 'accrued.'" *Roark v. 3M Co.*, 571 F. Supp. 3d 708, 711 (E.D. Ky. 2021) (quoting KY. REV. STAT. § 413.140(1)). For latent injuries, a claim accrues only when "the plaintiff discovers or in the exercise of reasonable diligence should have discovered not only that he has been injured but also that his injury may have been caused by the defendant's conduct." *Louisville Tr. Co. v. Johns-Manville Prods. Corp.*, 580 S.W.2d 497, 501 (Ky. 1979) (quoting *Raymond v. Eli Lilly & Co.*, 371 A.2d 170, 173 (N.H. 1977)).

Notably, the plaintiff only must know, "either actually or constructively, that the defendant '*may*' have caused his injury—definitive knowledge of causation is not required." *Roark*, 571 F. Supp. 3d at 712 (emphasis added) (citing *Louisville Tr. Co.*, 580 S.W.2d at 501); *see also Wiseman v. Alliant Hosps., Inc.*, 37 S.W.3d 709, 712 (Ky. 2000) (noting that either "actual or constructive knowledge . . . triggers the running of the statute of limitations"). While actual knowledge is established by direct, personal awareness of a condition, constructive knowledge is established by "awareness of sufficient 'critical facts' to put the plaintiff on notice" of that

[4] Federal courts sitting in diversity use state law discovery-rule mechanics. *See Cahio v. Drexel Chem. Co.,* No. 21-5036, 2022 WL 1698386, at *1 (6th Cir. May 27, 2022) ("In diversity cases, we apply state law to determine the relevant statute of limitations as well as the accompanying discovery rule"); *see also Asher v. Unarco Material Handling Co.*, 596 F.3d 313, 322 (6th Cir. 2010) (refusing to apply Kentucky's discovery rule to toll the statute of limitations after interpreting the intent of Kentucky's courts, "[c]onsistent with our role as a federal court sitting in diversity"); *Cummins v. Upjohn Co.,* No. 93–1846, 1994 WL 262062, at *2 (6th Cir. June 14, 1994) (applying Kentucky law to determine the applicability of the discovery rule to a wrongful death action).

condition. *Roark*, 571 F. Supp. 3d at 712 (quoting *Boggs v. 3M Co.*, No. 11-CV-57, 2012 WL 3644967, at *3 (E.D. Ky. Aug. 24, 2012), *aff'd on other grounds*, 527 F. App'x 415 (6th Cir. 2013)). Importantly, "once the plaintiff knows he has been injured, even if he does not have actual or constructive knowledge of who caused his injury, he 'has a duty to investigate and discover the identity of the tortfeasor within the statutory time constraints.'" *Id.* (quoting *Queensway Fin. Holdings Ltd. v. Cotton & Allen, P.S.C.*, 237 S.W.3d 141, 151 (Ky. 2007)).

Several important principles converge in this case.

First, the discovery rule requires diligence by a plaintiff, both as to the fact and cause of injury. "Under the 'discovery rule,' a cause of action will not accrue until the plaintiff discovers (or in the exercise of reasonable diligence should have discovered) not only that he has been injured, but also that this injury may have been caused by the defendant's conduct." *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 60 (Ky. 2010) (alterations in original omitted). As the Circuit has stated, "[t]he knowledge required is two-pronged: the limitations period is triggered when the plaintiff knows or should know 'not only that [s]he has been injured but also that h[er] injury may have been caused by the defendant's conduct.'" *Cutter*, 2021 WL 3754245, at *3) (citing and quoting *Wiseman,* 37 S.W.3d at 712). Further, "Kentucky law distinguishes injury from harm. Harm is 'the existence of loss or detriment in fact of any kind to a person resulting from any cause,' while injury is 'the invasion of any legally protected interest of another,' or stated differently, the wrongdoing that caused the harm. *Wiseman*, 37 S.W.3d at 712–13 (quoting Restatement (Second of Torts § 7, cmt. (1965)))." *See Cutter*, 2021 WL 3754245, at *4.

Second, what is a plaintiff's duty? The cases call for ordinary care and diligence. *See Askin v. Univ. of Notre Dame*, No. 2022-CA-0775-MR, 2023 WL 4830863, at *5 (Ky. Ct. App. July 28, 2023) ("Under the discovery rule, the limitations period begins to run 'on the date of the

discovery of the injury, or from the date it should, in the exercise of ordinary care and diligence, have been discovered.'") (quoting *Hackworth v. Hart*, 474 S.W.2d 377, 379 (Ky. 1971)). Judge Smith limned the concept ably:

> Although the term reasonable diligence has not been defined with specificity, courts have interpreted it to mean "a degree between absolute inaction and an extreme effort undertaken against apparent futility[;] it must be more than merely perfunctory." *Blanton v. Cooper Indus., Inc.*, 99 F. Supp. 2d 797, 802 (E.D. Ky. 2000) (quoting *Gray v. Sawyer*, 247 S.W.2d 496, 498 (Ky. 1952)). The *Blanton* court also noted that other courts have defined reasonable diligence to mean "a plaintiff must be as diligent 'as the great majority of persons would [be] in the same or similar circumstances.' ... 'Plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach.'" *Blanton*, 99 F. Supp. 2d at 802 (citations omitted). Further, "[a]n injured party has an affirmative duty to use diligence in discovering the cause of action within the limitations period."

*Manning v. Arch Wood Prot., Inc.,* No. CV 13-127-HRW-CJS, 2016 WL 7910818, at *3 (E.D. Ky. Aug. 30, 2016) (citing also *Fluke*), *report and recommendation adopted*, No. CV 13-127, 2017 WL 11675700 (E.D. Ky. Sept. 27, 2017). As the Kentucky Court of Appeals most recently framed it:

> The discovery rule uses a reasonably prudent person test. *Davis v. All Care Med., Inc.*, 986 S.W.2d 902, 906 (Ky. 1999). The "reasonable person" standard is an often-utilized term of art that involves an inherently objective test: a reasonable person is "a person who exercises the degree of attention, knowledge, intelligence, and judgment that society requires of its members for the protection of their own and of others' interests. The reasonable person acts sensibly, does things without serious delay, and takes proper but not excessive precautions." *Wilson v. Commonwealth*, 628 S.W.3d 132, 143 (Ky. 2021) (citing *Reasonable Person*, *Black's Law Dictionary* (8th ed. 2004)).

*Auxier v. Nithyanandam*, No. 2025-CA-0889-MR, 2026 WL 2356252, at *7 (Ky. Ct. App. Aug. 14, 2026).

Critically, and contrary to Plaintiffs' advocacy, "a formal medical diagnosis is not required to fulfill the notice of injury prong of the discovery rule." *Askin*, 2023 WL 4830863, at *6. *Askin* endorsed notice as the earlier of a plaintiff being informed of injury by competent medical

authority or when, "by exercise of reasonable diligence, he should have discovered that he ha[d] been so injured." *See id.* Further, "definitive knowledge of causation is not needed." *Adams v. 3M Co.*, No. CIV. 12-61-ART, 2013 WL 3367134, at *3 (E.D. Ky. July 5, 2013). Under the knowledge principles of the discovery rule, as Judge Thapar stated in *Adams*, "[c]onstructive knowledge, through awareness of sufficient 'critical facts' to put the plaintiff on notice, will trigger the statute of limitations period. . . . So, for purposes of the discovery rule, once the plaintiff encounters facts that 'should excite his suspicion' he effectively has 'actual knowledge of th[e] entire claim.'" *Id.*, at *2–3 (quoting *Fluke*, 306 S.W.3d at 64). *See also Auxier*, 2026 WL 2356252, at *5 (quoting the same principle directly from *Adams* and citing *Fluke*).

Finally, and regarding the need for a fixed diagnosis, a lay plaintiff typically may rely on the expertise of providers as part of discovery tolling. This is particularly apt when delay may have occurred through misdiagnosis (as described in *Askin*'s distinction of *Cutter*) or where doctors have difficulty in determining a problem that is not objectively ascertainable or medically explainable (as in *Auxier*'s distinction of *Wiseman*). However, the discovery rule, as Kentucky formulates it, does not await a doctor's definitive diagnosis. A plaintiff's diligence and constructive knowledge also implicate the date of accrual. *See Auxier*, 2026 WL 2356252, at *7 ("The discovery rule extends the commencement of the statute of limitations only up to the time that the harmful effect of the complained of negligence first manifests itself.") (citing *Hall v. Musgrave*, 517 F.2d 1163, 1167 (6th Cir. 1975)).

## III. ANALYSIS

The Court first notes Plaintiffs' objection to the form of some evidence. Plaintiffs have challenged the admissibility of 3M's evidence in a separate filing, *see* DE 74 (Objections to Admissibility). The Court agrees with 3M's responsive analysis and will not, for this decision,

conclude that the referenced evidence is irrelevant, prejudicial, unauthenticated, or inadmissible hearsay, *see* DE 76 at 12–13. A party seeking summary judgment "is not required to 'produce evidence in a form that would be admissible at trial.'" *McGuire v. Mich. Dep't of Cmty. Health*, 526 F. App'x 494, 496 (6th Cir. 2013) (quoting *Celotex Corp.*, 106 S. Ct. at 2553). While "[t]he proffered evidence need not be in admissible *form*, . . . its *content* must be admissible." *Id.* (quoting *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997)). Thus, the relevant inquiry is not whether 3M's evidence, as it is presented here, is inadmissible; rather, it is whether that evidence, at trial, would or could be admissible. The proof, at least the part germane to the limitations analysis, properly bears on the Rule 56 rubric in the Court's view.

*Treatment and Diagnostic History*

The Court has surveyed the entire record, to include all briefing and all attachments. This included a granular audit of the medical records and the depositions of Mr. Hollins and Dr. Jawad.

Hollins mined for twenty years, and he wore a mask to protect himself from dust exposure. He perceived the dust risk and the specter of black lung. DE 72-19 at 240. He ceased employment as a coal miner in 2007.

The providers at issue in this case are NP Colley, Dr. Mansour, Dr. Jawad, and (radiologist) Dr. Ramakrishnan. In late 2021, Hollins contracted COVID. He saw NP Colley, a regular provider, for bronchitis and shortness of breath. She ordered an X-ray, which showed no acute abnormality but also indicated "moderately severe bilateral nodular pulmonary fibrosis," per the reading of Dr. Ramakrishnan. *See* DE 72-20; DE 72-21.

Then, beginning in early 2022, Hollins started to experience serious breathing difficulties. Hollins is a problematic historian, but he pegged the notably worsening issues to March of 2022, when Hollins had a cardiology appointment with Dr. Mansour. The record verifies that this

appointment was in March 2022. *See* DE 72-22. Per Hollins's own description of the time: "That's when I started noticing a difference. In the yard, I'd pick up sticks, and I'd be out of breath. I couldn't do nothing. I couldn't walk." DE 72-19 (Hollins Dep.) at 254. Mansour assessed Hollins for his shortness of breath, referring to Hollins's COVID from 9/21 as well as his chest X-ray. Mansour, in the record, quoted the radiological finding from 9/21 and assessed Hollins as having "lung fibrosis." DE 72-22 at 3. He ordered some cardiological testing but referred Hollins to pulmonologist Jawad for "further evaluation," specifically citing "moderately severe bilateral nodular pulmonary fibrosis." *See id.*

Hollins agrees that Mansour referred him to Dr. Jawad. *See* Hollins Dep. at 256. What did Hollins learn from Mansour? Curiously, when Hollins described the Mansour appointment at a February 2023 black lung screening, the records show the following: "He saw cardiology, Dr. Mansour approximately 1 year ago and had cardiac work-up for SOB. Dr. Mansour told him that he didn't have any issues with heart that his breathing difficulties stem from black lung disease and was referred to pulmonology, Dr. Jawad." DE 72-23 (records of NP Rasnick). Hollins, under oath, claims no one ever told him he had black lung until February of 2023, though one wonders how Rasnick, seeing Hollins for the first time, could possibly compose such a narrative absent information originating from Hollins himself.[5]

Now back to March 2022: Mansour referred Plaintiff to Jawad, but the record is silent for the next six months. Nothing shows any scheduling effort or initiation by Hollins, relative to seeing Jawad. Indeed, by September of 2022, Hollins was back in NP Colley's office regarding both hypertension and shortness of breath. Colley secured another chest X-ray, and Dr.

[5] And in the Complaint, Hollins alleges he "was not aware he had evidence of CWP until on or after March 23, 2023." DE 1 ¶ 15; ¶ 3 (alleging that at "no time prior to [March 23, 2023] did Plaintiff have knowledge that he suffered from coal worker's pneumoconiosis'). These statements are flatly inaccurate.

Ramakrishnan again read the film: "Findings: Complicated pneumoconiosis noted similar to prior exam. . . Impression: Stable complicated pneumoconiosis." DE 72-25. Colley reflected this in her notes, at DE 72-24. The visit prompted Colley herself to generate a "pulmonary referral." *Id.* She records that "patient agrees will make referral." *Id.* Colley specifically records the radiological finding and indicates that her office then tried to call Hollins (unsuccessfully) but "letter mailed." *Id.*

The Jawad visit did not occur until December, but Colley saw Hollins in the interim. *See* DE 72-26 (late September), 72-27 (late October). By this point, Colley (given the prior radiology report) directly includes "pneumoconiosis" in her assessment, with the plan in place for Hollins to see Jawad. *See* DE 72-25. In September, she says, "reviewed x-ray from 9/16/2022 shows pneumoconiosis" and references "+20 year of coal mining history." DE 72-26. The 10/22 entry confirms the same. *See* DE 72-27.

Hollins saw Jawad on December 8, 2022. See DE 72-29. Dr. Jawad's assessment: lung fibrosis and black lung. He referenced "history of fibrotic changes most likely due to coal worker pneumoconiosis" as well as a history "of coal worker pneumoconiosis" along with "severe and significant shortness of breath." *See id.* In testimony, Dr. Jawad qualified the definitiveness of his diagnosis, noting that he required a confirmatory CT result for a "final" diagnosis. DE 72-28 (Jawad Dep.) at 75. That said, he viewed the black lung diagnosis (which he confirmed in February of 2023, after the CT) as dating back to December of 2022. *See* Jawad Dep., at 64. Indeed, the billing code he used in December was for "coal workers' pneumoconiosis." *See id.* at 73. What did he tell Hollins? Jawad said he did not convey a "definite" diagnosis but said "Mr. Hollins, . . . I need to run further testing, you're at risk and there is signs that suggest you have black lung, or coal worker's pneumoconiosis, and by doing more testing, we'll be able to have a definite

answer." *Id.* at 71. This squares with Jawad's treatment note, which called black lung "the most likely" cause of Hollins's fibrotic changes. The CT and definitive diagnosis followed in February.

Hollins's recital of what he knew is very different. He categorically denies hearing about potential black lung or pneumoconiosis from anyone. *See* Hollins Dep., 241, 249. Dr. Jawad agreed that, in light of the gravity of pneumoconiosis and pulmonary fibrosis, a medical provider (including himself) would discuss suspected black lung with the patient. *See* Jawad Dep., at 55-56. Hollins, under oath, denies that Jawad (or any other provider) told him he had black lung. He claims first getting that diagnosis on February 9, 2023. *See* Hollins Dep., at 267. And again, as with the import of the Rasnick report, Dr. Jawad attributes the basis for his notes about Hollins's history (including prior fibrotic changes and suspected pneumoconiosis) to information from "Mr. Hollins and his records." Jawad Dep., at 50-51 (citing "the history that he gave me"). Despite that, Hollins claims ignorance regarding his medical record—that he was unaware of X-ray results, heard nothing about pneumoconiosis or black lung before 2/23, and had not seen or accessed any of his medical history. The Hollins deposition did not explore his interactions with Colley or Rasnick.

**A. Actual knowledge presents a disputed fact issue (barely).**

The actual knowledge question is a very close one. The record strongly supports the conclusion that Dr. Mansour examined Hollins, reviewed the radiograph from 9/21, and informed Hollins of likely black lung. The Rasnick record plainly conveys this, and there is no plausible explanation for how she would record such a history without hearing it from new patient Hollins himself. And yet, Hollins swears that no one conveyed a black lung diagnosis to him before February of 2023.

Hollins, as historian, presents significant credibility issues. For example, at the deposition he botched the Mansour treatment chronology (putting it in early 2023, rather than early 2022). *See* Hollins Dep., at 255. He misidentified Dr. Jawad as Dr. Jabbar, and he badly misidentified when he began taking albuterol. *See id.* at 241, 243. Further, Dr. Jawad attributed many of his critical historical notes to information from Hollins himself, including prior references to pneumoconiosis. Though in extreme cases (ones with objective proof like a videotape or incontestable content) a court can reject at summary judgment a plaintiff's sworn proof in blatant contradiction of the record, the Court is wary, from experience, of taking that route. *See Gambrel v. Knox Cnty., Kentucky,* 25 F.4th 391, 405 (6th Cir. 2022) (reserving to jury questions of credibility, among competing witnesses, even on largely "incredible" testimony, where testimony "does not conflict with objective (and indisputably authentic) evidence like a video or audio recording").

Perhaps here Hollins is strictly parsing his specific testimony and claiming that he did not get a *definitive* diagnosis until February 2023. However, his claimed ignorance is far broader than that. He denies any communication to him of black lung or pneumoconiosis—"no one ever told me." Hollins Dep., at 249. It stretches credulity (not to mention the likely standard of care) to think that none of Colley, the radiologist, Mansour, or Jawad would counsel and inform Hollins of his status (pneumoconiosis as early as September 2022, moderately severe pulmonary fibrosis as early as September 2021) and suspected condition from September 2021 all the way through December 2022. How would a provider justify a treatment course or secure informed consent (for X-rays or pulmonary function testing or a CT) without explaining the diagnostic landscape? Yet, Hollins claims to have been an informational blank slate until February 2023, when Jawad's final diagnosis issued. This, of course, is critical to the timeliness analysis.

If Mansour (a cardiologist with a radiologist-read film in hand) told Hollins he had black lung in March of 2022, Hollins's action would have accrued then. Given Hollins's awareness of his own mining history, the black lung risk, his debilitated breathing status, and his lengthy preventive mask use, Hollins would have been on notice of critical facts to excite his suspicion of a claim at that time, the *Fluke* paradigm. The same goes for potential information from September of 2022 and, certainly, December of 2022. If on notice of pneumoconiosis (as read by the radiologist and conveyed to the NP) and/or black lung likelihood (as determined by a pulmonologist), Hollins would, given his full history, be charged with timely pursuing his claim. Any reasonable person facing these facts would at least be suspicious that the respirators he wore might not have worked as promised against the very risk they addressed. *See Adams,* 2013 WL 3367134, at *4. However, Hollins denies getting any of the critical health information. The Court, in deference to Hollins's testimony of ignorance, would find a factual dispute over what he actually knew and when. That issue would otherwise be one reserved to the jury.

**B. Hollins, with reasonable diligence, should have known of his injury and 3M's potential liability by no later than December 8, 2022.**

The issue of what Hollins actually knew raises a disputed question; the issue of what he *should* have known does not. In the exercise of reasonable diligence, Hollins would have known of his claim by no later than December 8, 2022, making this case untimely.

Although Hollins denies any knowledge of or insight into his specific condition in advance of Dr. Jawad's formal diagnosis in early 2023, the law requires more initiative than Hollins, on this record, displayed. Again, with a 20-year mining history and record of dust exposure/mask use, Hollins was well aware of his personal background. His breathing took a sharp turn in early 2022, one he first "noticed" at that time. The condition, as depicted, surely was debilitating, as Hollins claims any exertion was too much and that, due to shortness of breath, he could not even

walk. The discovery rule's impetus is protection against the fairness of a strict time bar for an unknowable injury. Yet, a plaintiff must "exercise . . . reasonable diligence" and accrual tolls only until "the plaintiff either knew or had reason to know of the disease." *Louisville Tr. Co.,* 580 S.W.2d at 499. This is fair for one "whose symptoms had not yet obtruded on his consciousness." *See id.* at 500. That was not Hollins's status during the March to December 2022 period.

Hollins saw Colley back in September 2021 and had the first chest X-ray. He claims ignorance of any result. Maybe. Certainly, and assuming Colley told him nothing, the record shows no inquiry by Hollins about that radiograph. If he had inquired, the result was a finding of "moderately severe bilateral nodular fibrosis." DE 72-21.

As to Mansour, Hollins denies learning anything beyond that Mansour would make a referral to pulmonologist Jawad. Though the record strongly supports that Mansour discussed Hollins's lung status and referenced black lung, what the Court knows is that, had Hollins queried Mansour, he surely would have learned what Mansour recorded in his note—existence of lung fibrosis based on imaging that, as earlier discussed, showed "moderately severe bilateral nodular fibrosis." The finding is what prompted the Jawad referral. It simply is not reasonable for a plaintiff, suffering from debilitating breathing issues, to see a specialist and not, at minimum, inquire about the doctor's findings and plan. Any competent doctor would convey that information, and Mansour likely did, but if Hollins remained in ignorance he had an affirmative duty to ask Mansour about his assessment and treatment.

Then, a key temporal gap: Though Mansour planned a referral to Dr. Jawad, the record shows no activity relative to Dr. Jawad from March 2022 through Hollins's visit to Colley in September of 2022. Thus, Hollins, whose symptoms per Colley had "worsen [sic]," DE 72-24 at 5, took no evident steps to prompt, follow up on, or effect Mansour's referral. He already had

shown himself capable of initiating care via the self-referral to Mansour. Now, despite deteriorating status, there is no urgency or affirmative effort by Hollins, in this record, to connect with Jawad. For six months, the status quo persisted, with Hollins getting worse, knowing that Mansour was not the answer, and yet the Jawad visit was not set. This is not affirmative diligence to answer the medical question. It bespeaks the pole of "absolute inaction" referenced in *Blanton*. *See Blanton*, 99 F. Supp.2d at 802 (quoting *Gray*, 247 S.W.2d at 498).

Finally, Colley, with urgency given the September 2022 visit, implements the referral. By this point, Dr. Ramakrishnan expressly found "complicated pneumoconiosis." Colley knew this. The record shows that she conferred with Hollins about and got his assent to the resulting Jawad referral. DE 72-24 at 5. There is a strong inference of further communication by Colley's office, prompted by the X-ray, including the attempted phone call and the "letter mailed" entry. Again, Hollins is a blank slate on confessed knowledge. If he had queried Colley, he certainly would have learned the radiologist's finding of "complicated pneumoconiosis." A diligent but suffering patient surely would not accept mere silence with respect to what a test result showed. With diligence, he would have known the radiological status in mid-September. Such knowledge undoubtedly would be a critical fact exciting Hollins's suspicion about his status and potential claim.

The ensuing weeks fortify this conclusion. Hollins saw Colley again in September and in October. DE 72-26; 72-27. By those visits, Colley herself was recording "pneumoconiosis" as a formal assessment. In late September, she summarized "reviewed x-ray from 9/16/2022" and restated the pending referral. It simply would not, under any reasonable approach, satisfy diligence for Hollins to have submitted to the latest chest X-ray but not inquired about the result. A query would have produced concrete knowledge that a radiologist deemed him to have complicated

pneumoconiosis.[6] A similar assessment (with the same particulars) appears in October, though the Jawad appointment has been accelerated into December 2022. Colley then noted the "SOB with exertion" as part of the referral impetus. Again, any ordinary inquiry of status by Hollins would have provided him all of these insights. Notice of pneumoconiosis, an occupational lung disease, Jawad Dep. at 24, would undoubtedly have catalyzed a definitive inquiry by a diligent plaintiff with Hollins's symptoms and work history.

Finally, Hollins saw Jawad on December 8, 2022. Jawad, without dispute, viewed black lung as the "most likely" problem. He deferred a formal or definite answer pending the diagnostic CT, but he also characterized his diagnosis as going back to December. Hollins pins his entire hopes, regarding timeliness, on the date of definitive diagnosis, but Kentucky law does not endorse that result. Instead, the full record as of December 8, 2022 shows multiple physicians or providers pointing directly to pneumoconiosis and black lung. Jawad felt the same, with his "most likely" determination. Hollins may not have heard any of this, but a simple query would have provided the information. Hollins should have known that he had X-ray confirmed pneumoconiosis and that his treating pulmonologist found black lung "most likely," assessing him as such.[7] That is, under any rational conception, constructive knowledge of injury.[8]

---

[6] The Court rejects the suggestion that Colley showed confusion in her record. She may not be qualified to diagnose black lung, but she is surely entitled to quote and rely on the interpretation of a radiologist. Further, her note, in context, is not suggesting that COVID *caused* pneumoconiosis. The full sentence shows that the "due to history of Covid" phrase is modifying her reasoning for the PFT and pulmonary referral. Regardless, the question is what Hollins should have known in the exemplification of proper diligence. He should, in this circumstance, have known the gist of what Colley put in her records.

[7] "Likely" has recognized meaning. Merriam-Webster defines it as "having a high probability of occurring or being true: very probable." *See likely*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/likely (last visited Sept. 25, 2026).

[8] By that point, Hollins surely had access to "'knowledge of the probability of disease.'" *Combs v. Albert Kahn Assocs., Inc.*, 183 S.W.3d 190, 197 (Ky. Ct. App. 2006) (quoting *Carroll v. Owens–Corning Fiberglas Corp.*, 37 S.W.3d 699, 701 (Ky. 2000)). With Dr. Jawad characterizing black lung as "most likely" to blame, his circumstance was hardly still of the "inherently unknowable" type, *Louisville Trust*, 580 S.W.2d

Importantly, this is not a scenario where Hollins's problem was, even to the providers in real time, medically unexplainable or not objectively determinable. Hollins was not misdiagnosed during the treatment process, quite unlike the plaintiff in *Cutter*, whose delay that court excused as reasonable. *See Askin*, 2023 WL 4830863, at *6 (discussing *Cutter*). Hollins did not face providers flummoxed by his circumstance, such as those in *Wiseman* "where multiple doctors . . . were all 'indefinitive [sic] as to the origin'. . . of 'medically unexplainable pain.'" *Auxier*, 2026 WL 2356252, at *5 (discussing *Wiseman*). Indeed, each provider involved—radiologist Ramakrishnan, NP Colley, cardiologist Mansour, and pulmonologist Jawad—pointed to the same landing points of lung fibrosis, pneumoconiosis, and black lung.

And where is the diligence? This Court, in *Blanton*, characterized the standard as not allowing plaintiffs to "close their eyes to means of information reasonably accessible to them." *Blanton*, 99 F. Supp.2d at 802. Instead, they must give attention to particulars "which may be inferred to be within their reach." *Id*. *Auxier* defined it as a duty to act self-protectively, "sensibly, . . . without serious delay, [taking] proper but not excessive precautions." *Auxier*, 2026 WL 2356252, at *7. It hardly asks too much to demand that a plaintiff, clearly on notice of a serious breathing issue, stay reasonably abreast of what his providers are perceiving, assessing, and recording as to diagnoses and plans of care. Indeed, that currency would be the baseline expectation as to both sides in the doctor-patient relationship. Even if the providers failed in communication here, which the Court finds extremely unlikely, Hollins, by simply inquiring, had all of the pertinent information readily at hand. Plaintiff had a "an affirmative duty to use diligence in discovering the cause of action," and "constructive knowledge" is "the statute's trigger." *Fluke*,

at 501, that undergirds the tolling of accrual. The nine months that elapsed between the Mansour and Jawad visits surely is not consistent with any conception of diligence.

306 S.W.3d at 64 (as to "affirmative duty") (quoting *Hazel v. General Motors Corp.*, 863 F. Supp. 435, 440 (W.D. Ky. 1994)); *Auxier*, 2026 WL 2356252, at * 7 (as to "trigger"). Hollins knew or should have known, as of December 8, 2022, that he suffered from lung fibrosis, complex pneumoconiosis, and, most likely, black lung. His clock started no later than that date.

Tolling beyond December 8, 2022, to await the CT confirmation, exceeds the limits of the discovery rule. A plaintiff armed with or, if diligent, having reasonable access to sufficient information cannot "wait for [a confirming doctor] to connect the dots for him as a starting point." *Auxier,* 2026 WL 2356252, at *7; *see also Askin*, 2023 WL 5830863, at *6 (noting that plaintiff "had been placed on notice that he might be suffering from a brain disease caused by the concussions he suffered playing football" because medical providers "seemed prepared to attribute his symptoms to the concussions").

This case is time-barred.

**C. Kentucky's one-year statute of limitations for personal injury claims applies to plaintiffs' breach of warranty claim.**

Finally, the Court addresses 3M's argument that Plaintiffs' breach of warranty claim is untimely under the four-year statute of limitations for sales contract claims. 3M is correct that the Uniform Commercial Code ("UCC"), which has been largely adopted in Kentucky, prescribes a "four[-]year statute of limitations" for such claims. *See Williams v. Fulmer*, 695 S.W.2d 411, 412 (Ky. 1985) (citing KY. REV. STAT. § 355.2–725). However, the Eastern District of Kentucky has previously noted that "where [an] action is essentially for personal injury," like the present action, the one-year statute of limitations for personal injury claims "applies despite . . . allegations of breach of warranty." *See Harris Corp., Data Commc'ns Div. v. Comair, Inc.*, 510 F. Supp. 1168, 1172 n.16 (E.D. Ky. 1981) (citing *Finck v. Albers Super Markets, Inc.*, 136 F.2d 191, 194 (6th Cir. 1943)). Thus, the Court finds that the one-year statute of limitations for personal injury claims

applies to all of Plaintiffs' claims, and that Plaintiffs' claims are timely for the above-stated reasons.

## IV. CONCLUSION

Accordingly, the Court GRANTS 3M's motion for summary judgment. *See* DE 72. The Court will enter a separate Judgment.

This the 25th day of September, 2026.

**Signed By:**

***Robert E. Wier*** REW

**United States District Judge**